IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KIMBERLY JO WOOSLEY, ) | |
| ) | |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | Civil No. 3:09-0910 |
| ) | Judge Trauger |
| JAY SHERMAN WOOSLEY, ) | |
| ) | |
| Debtor-Appellant. ) | |
| ) | |

## MEMORANDUM

This is an appeal from the decision of United States Bankruptcy Judge Harrison on cross-motions for partial summary judgment in the adversary proceeding of *Woosley v. Woosley*, No. 3:08-ap-204. In that decision, among other things, Judge Harrison granted the plaintiff's Motion for Partial Summary Judgment, finding that the debts that defendant-debtor Jay Woosley incurred through a post-divorce sales agreement with his ex-wife, plaintiff Kimberly Woosley, were non-dischargeable. (Adversary Proceeding Docket No. 72 at 7.) Jay Woosley has appealed that decision, and, for the reasons discussed herein, the Bankruptcy Court's decision on this issue will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The Woosleys were married on June 15, 1991.[1] In the 1970s, the plaintiff's father, Gary Mendl, started a company called Tennessee Lawn Maintenance (TLM), which was a landscape,

---

[1] Unless otherwise noted, the facts are drawn from the parties' appellate briefs (Docket Nos. 2 and 7).

1

landscape maintenance, and irrigation company that performed work for residential and commercial customers. The plaintiff's mother also started a successful company, called Williams Home Place. Growing up, the plaintiff became very familiar with both businesses, and, after receiving training as an accountant, she performed accounting services for both businesses. Indeed, the Woosleys apparently met each other when Jay Woosley was working at TLM in 1991.

Jay Woosley apparently gained additional experience in lawn maintenance, and, by the late-1990s, Mr. Mendl began discussions regarding selling TLM to the Woosleys. While it is undisputed that, after an additional year of working with Jay Woosley at TLM, Mr. Mendl did transfer his interest in the company to the defendant, the parties dispute whether the plaintiff acquired an interest in TLM at that time as well. Ms. Woosley claims that she acquired a one percent interest in TLM through the transfer, while Mr. Woosley claims that the transfer from Mr. Mendl gave him a complete ownership interest. Ms. Woosley's claims of joint ownership are supported by various documents in the record. (*See e.g.* Adversary Proceeding, Docket No. 1 Ex. 1 at 3-4.)

Either way, over the course of the next several years, Ms. Woosley divided her time between working for TLM, Williams Home Place, and raising the couple's three children. During this time period, Ms. Woosley handled "the books" for TLM, while Mr. Woosley managed client relations, the field crews, and other operational aspects of the business. While the parties dispute the financial security of the business, there appears to be no dispute that TLM was able to meet its obligations to creditors and, along with Ms. Woosley's work at Williams

2

Home Place, provide a reasonably comfortable living for the Woosleys.

In 2006, the Woosleys' marriage began to deteriorate, and, in April 2007, Ms. Woosley filed for divorce in Tennessee state court. In the course of their divorce proceedings, the Woosleys agreed to terms of a Marriage Dissolution Agreement (MDA). (Adversary Proceeding, Docket No. 1 Ex. 1.) Under the terms of the MDA, upon the entry of the Divorce Decree, Mr. Woosley agreed to disclaim any interest in the family home, and, when the home was sold, he would be entitled to one-half of the equity in the property at the time of the MDA, or $31,000. (*Id.* at 3.) That is, upon the eventual sale of the home, Mr. Woosley would be paid $31,000, no matter how the value of the home might have changed between the MDA and its sale. (*Id.*)

Also, importantly, the MDA provided that Ms. Woosley would own 49 percent of TLM and Mr. Woosley would own 51 percent of TLM. (*Id.* at 4.) The parties further agreed that Ms. Woosley "will continue to be allowed to work for [TLM] on a part-time basis as scheduling coordinator and office manager at her current salary level or as further agreed by the parties." (*Id.*) The parties also acknowledged that Ms. Woosley would not be required to "obligate herself personally for any future financial obligations of the company." (*Id.*) The parties also "waive[d] any and all claims for alimony against the other." (*Id.*)

On July 31, 2007, a final decree of divorce was entered in Tennessee Circuit Court. (Adversary Proceeding, Docket No. 41 Ex. 1.) The divorce decree incorporated the MDA and a Parenting Plan that the Woosleys had also agreed to, by which, among other expenses and obligations, Mr. Woosley agreed to pay his ex-wife $597 per month in child support. (*Id.* at 2,

3

19.)

Very soon after the Divorce Decree was entered, it became clear to the parties that they could not continue to work together at TLM. Ms. Woosley claims that "[a]lmost immediately after the divorce, Mr. Woosley started harassing [her] and making it very difficult for her to do her work for the Company." (Docket No. 7 at 2.) Mr. Woosley cites the fact that "the offices of TLM were located in the former marital residence which [he] relinquished to the Plaintiff in the divorce" as a major source of the difficulty. (Docket No. 2 at 5.)

Either way, the parties began negotiating an agreement that would sever their business relationship. While various proposals were apparently exchanged over weeks of negotiations, the parties, on November 27, 2007, finally agreed to a deal by which Mr. Woosley would buy Ms. Woosley's 49 percent interest in TLM (the "November Agreement"). (Adversary Proceeding, Docket No. 40 Ex. 1.) Specifically, under the terms of the November Agreement, Ms. Woosley agreed to receive payments in the amount of $1,500 per month for 10 years ($180,000) as "compensat[ion] for selling her forty-nine percent of the marital business, which was divided . . . pursuant to the Final [Divorce] Decree." (*Id.* at 1, 4.) There are several other places in the November Agreement where the Agreement refers to the divorce, the Divorce Decree, and the fact that Ms. Woosley's 49 percent interest was acquired through the Divorce Decree. (*Id.*)

The November Agreement contains numerous other provisions regarding the timing of the monthly payment, penalties for late payment or non-payment and so forth. Additionally, the parties agreed that, at the closing of the November Agreement, Ms. Woosley would buy Mr.

4

Woosley's equitable interest in the marital home, rather than upon the eventual sale of the house. (*Id.* at 4.) Specifically, the November Agreement called for Mr. Woosley to receive $15,500 at the signing of the November Agreement and the balance of his $31,000 equity interest (in cash, property, and forgiven debt) when he vacated the marital home. (*Id.*) It is clear that, through the November Agreement, Ms. Woosley gave up a considerable amount of money; that is, the $2,200 per month that she made at TLM, the present value of her ownership interest and the prospect of its being enhanced over time, and the $600 per month that she received in rent from TLM for use of the marital home. (Docket No. 7 at 2.)

While the basis for its collapse remains the subject of dispute, it is clear that TLM did not fair well under Mr. Woosley's independent leadership. Ms. Woosley claims that her ex-husband "had not devoted adequate time and effort to the business," was hostile and rude to the customers, was not mentally balanced and also took exotic and lengthy SCUBA vacations when he should have been working to repair the damage he was doing to the business. (Docket No. 7 at 2.)

Mr. Woosley contends that, until his ex-wife finally left TLM and turned over the books and records of the company, he did not grasp the dire financial straits in which the company found itself. (Docket No. 2 at 6.) He accuses his ex-wife of failing to timely pay payroll taxes or operating expenses, and he claims that "plaintiff used company monies . . . to pay her personal expenses." (*Id.*) While conceding that he did have anger issues at this time and that he took vacations, Mr. Woosley claims that he used his "best efforts" to save TLM, but "it became clear . . . that the business of TLM could not survive as a proximate result of the failures of the

5

Plaintiff." (*Id.*)

Ms. Woosley strongly denies ever skimming money from TLM and states that, while she did miss one tax payment, she did not mismanage TLM, had loved TLM since she was a child, and had every incentive to see it remain successful. (Docket No. 7 at 3.) Whatever the reasons for the failures of TLM, Mr. Woosley decided to shutter the business on January 23, 2008. He claims that, "because he was personally obligated on virtually all of the business debt," he had no choice but to file a Chapter 7 Petition in the Bankruptcy Court for the Middle District of Tennessee, which he did on February 19, 2008. (Docket No. 2 at 6.)

On May 23, 2008, Ms. Woosley filed her "Complaint to Have Debt Declared Nondischargeable under 11 U.S.C. § 523(a)(5), 523(a)(15) and/or 523(a)(2), or, in the Alternative, to Bar Debtor's Discharge Under 11 U.S.C. § 727." (Adversary Proceeding, Docket No. 1.) Among other arguments advanced in her Complaint and in subsequent summary judgment briefing, Ms. Woosley claimed that the $1,500 per month obligation flowing from the November Agreement is non-dischargeable in Mr. Woosley's bankruptcy case because, under the Bankruptcy Code, it was incurred "in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record." (*See id*. at 8; 11 U.S.C. § 523(a)(15)).

The Adversary Proceeding proceeded through discovery and dispositive motion briefing, and, on May 28, 2009, in ruling on the parties' cross motions for summary judgment, Judge Harrison concluded that, as a matter of law, the November Agreement obligation was a non-dischargeable debt. Specifically, Judge Harrison concluded that, "clearly," Mr. Woosley's

6

November Agreement debt to his ex-wife was incurred "in the course of, or in connection with, a divorce or separation agreement," and, therefore, the debt was non-dischargeable under Section 523(a)(15) of the Bankruptcy Code. (Adversary Proceeding, Docket No. 72 at 5.) Judge Harrison granted the defendant's motion for an interlocutory appeal of this issue on September 22, 2009. (Adversary Proceeding, Docket No. 96.)

## STANDARD OF REVIEW

This court has jurisdiction over this appeal under 28 U.S.C. § 158(a). In reviewing an appeal from a bankruptcy court's order, the district court reviews the bankruptcy court's findings of fact for clear error and the court's conclusions of law *de novo*. *In re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998).

## ANALYSIS

The debtor/defendant brings only one issue to the court on this appeal, that is, "whether the Bankruptcy Court properly determined that, as a matter of law, the debt owed to the plaintiff is non-dischargeable under Bankruptcy Code Section 523(a)(15) because it represents the modification of a [MDA] and not a separate and independent post-divorce obligation." (Docket No. 2 at 1.)

### I. The Nature of the Debt

In her Memorandum that granted the plaintiff's Partial Motion for Summary Judgment, Judge Harrison concluded that the November Agreement amounted to a "modification" of the MDA. (Adversary Proceeding, Docket No. 72 at 4.) Based upon this finding, Judge Harrison went on to conclude that, as a modification, the "November 2007 amendment to the Divorce

7

Decree is clearly 'in connection with' the Divorce Decree," and, therefore, the debts that Mr. Woosley incurred under that Agreement are non-dischargeable under Section 523(a)(15) of the Bankruptcy Code. (*Id.* at 4-5.)

Section 523(a)(15) of the Bankruptcy Code states that an "individual debtor" will not be discharged "from any debt . . . to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) [domestic support obligations] that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit."[2] 11 U.S.C.§ 523(a)(15). The defendant argues that, under settled principles of statutory interpretation, the debt owed by the defendant to his ex-wife here cannot be considered to have been "incurred" either "in the course of a divorce or separation" or "in connection with a separation agreement, divorce decree or other order . . . ." (*See generally* Docket No. 2.)

The starting point for the defendant's argument is that "a basic principle of bankruptcy is

---

[2]As indicated, Section 523(a)(5) of the Bankruptcy Code is a similar provision, rendering non-dischargeable any debt incurred for a "domestic support obligation." 11 U.S.C. § 523(a)(5). While, before Judge Harrison, the plaintiff argued that Section 523(a)(5) was applicable to the November Agreement debt, for purposes of this appeal, both parties appear to view the debt as "not of the kind described in paragraph (5)." It is also worth noting that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 governs these proceedings and that the BAPCPA made key changes to Section 523(a)(15). *In re Cheatham*, 2009 WL 2827951, *3 (N.D. Ohio Sept. 2, 2009)). These changes, among other things, eliminated an equitable balancing that the court was to conduct after finding that the debt had sufficient connection to the divorce. *Id.* at *4. As the defendant recognizes, it is no longer necessary for the court to engage in this balancing, and the only question for the court now is whether there is a sufficiently close connection between the divorce proceedings and the debt to render the debt non-dischargeable. (*See* Docket No. 2 at 10.)

8

that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." (Docket No. 2 at 11)(quoting *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997)). The plaintiff effectively counters this argument by pointing out that the "policy of protecting and favoring the debtor is tempered, however, when the debt arises from a divorce or separation agreement. . . . Bankruptcy law has had a longstanding corresponding policy of protecting a debtor's spouse and children when the debtor's support is required." (Docket No. 7 at 7)(quoting *In re Crosswhite*, 148 F.3d 879, 881-882 (7th Cir. 1998); *see also Gibson v. Gibson*, 219 B.R. 195, 201 (6th Cir. BAP 1998)(finding that "debts incurred in a divorce proceeding are now generally nondischargeable in bankruptcy" under Section 523(a)(15)). Therefore, the defendant is not entitled to an especially strict or narrow interpretation of the statute here.

Next, the defendant argues that, because the November Agreement was not signed until almost four months after the parties' divorce and was signed without any court oversight, the debts associated with the November Agreement do not have sufficient connection to the divorce proceedings to fall within the scope of Section 523(a)(15). (Docket No. 2 at 13.) While there does not appear to be a wealth of case law under Section 523(a)(15) interpreting the non-dischargeability of debts incurred through private, post-divorce agreements between former spouses, the defendant does cite one case from a bankruptcy court in Florida that found that, because a post-divorce indebtedness did "not fall squarely within the terms of the Final Judgment of Dissolution of Marriage" and was a "new debt" incurred by the debtor after the divorce, the debt did "not fall within the exception[] to dischargeability set forth in . . . Section

9

523(a)(15) of the Bankruptcy Code." (Docket No. 2 at 15)(quoting *In re Petty*, 333 B.R. 472, 482 (M.D. Fla 2005)).

The defendant also argues that, while the term "in connection with" is not defined in the Bankruptcy Code, other courts, contrary to Judge Harrison's conclusion that the November Agreement was "clearly" "in connection with" the MDA/Divorce Decree, have interpreted the term "in connection with" to generally mean to "coincide" with or to be "in close proximity to," and, clearly, the MDA/Divorce Decree and the November Agreement do not "coincide" as they are separated by about four months of time. (*Id.* at 16)(citing *Merrill Lynch v. Dabit*, 547 U.S. 71, 85)(securities fraud case); *U.S. v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009)(drug trafficking case). In light of this, the defendant concludes that "the only way the $180,000 debt could be found non-dischargeable under [] Section 523(a)(15) would be to ignore the clear language of the statute." (*Id.* at 17.)[3]

In response, the plaintiff argues that the phrase "in connection with" should be given a broad meaning, particularly in light of the "realities of divorces, where the parties may return to the divorce court for many years after the entry of the actual divorce decree, for modifications of

---

[3] The defendant then embarks on a lengthy discussion of why, under Tennessee law, the November Agreement does not constitute a "modification" of the MDA. (*Id.* at 18-25.) Under Tennessee law, a contract "modification" may add or subtract certain details or terms but leaves the "general purpose and effect of the contract undisturbed." *Interstate Marketing Corp. v. Equipment Servs., Inc.*, 2006 WL 1547867, *4 (Tenn. Ct. App. June 6, 2006). While the court ultimately agrees with the disposition reached by Judge Harrison, it is reluctant to put too much weight on the modification issue. Ultimately, the issue is whether, as a matter of federal Bankruptcy Law, the phrase "in the course of" or "in connection with" can be extended to include debts incurred several months following the divorce decree. Indeed, as can be seen herein, it is not necessary to delve into the modification thicket to resolve this issue and affirm the Bankruptcy Court's judgment.

10

alimony, child support, custody, property transfers and all other possible kinds of obligations, as well as simply to enforce the existing decree." (Docket No. 7 at 9.) The plaintiff also attempts to distinguish the *Petty* case, cited above, on the grounds that, in that case, the debt arose from a credit card opened by the debtor, used by his new wife and the "debt [] did not arise out of a contract between Debtor and the former spouse that related back" to the MDA and the Divorce Decree. (*Id.* at 11.) The plaintiff goes on to attempt to distinguish the other, less persuasive and relevant cases cited by the defendant and then concludes by arguing that the November Agreement was a "modification" of the MDA. (*Id.* at 11-17.)

While the court cannot locate a Sixth Circuit case with facts that precisely mirror those in this case, the Sixth Circuit has provided some guidance in interpreting and applying Section 523(a)(15). For instance, in *Gibson*, quoting another case, the court noted that "Section 523(a)(15) does not require that a court order the debt be paid directly to the spouse. The statute provides that a debtor is not discharged from *any* debt incurred by the debtor in the course of a divorce or in connection with a divorce decree." *Gibson*, 219 B.R. at 203 (emphasis in original)(internal quotation and citation omitted). While *Gibson* does not involve facts that are squarely on point, this language indicates that the Sixth Circuit takes a broad view of non-dischargeability under Section 523(a)(15) and also indicates that debts incurred through private agreements like the one in this case qualify for non-dischargeability.[4]

---

[4] The court has located several district court cases in this circuit that imply that, to be nondischargeable under Section 523(a)(15), the debt must arise directly from the text of the MDA or the divorce decree. *See McCracken v. LaRue*, 204 B.R. 531, 534 (E.D. Tenn. 1997)("Fundamental to the maintenance of any complaint seeking a determination of the dischargeability of a debt under [Section 523(a)(15)] is the requirement that the debtor must be

11

In *Beale v. Kurtz*, 381 B.R. 727 (S.D. Ind. 2008), the district court for the Southern District of Indiana was faced with a very similar case to the one before this court. As here, the parties, prior to their divorce, divided up their property pursuant to an MDA. *Id.* at 730. In this agreement, Kurtz (the ex-wife) received the couple's 2003 Jeep Cherokee and Beale (the ex-husband) incurred the responsibility for making the payments on that vehicle. *Id.* Also, among other things, Beale received the couple's home, but he was obligated to pay Kurtz $3,600 for draperies that Kurtz had purchased on her credit card. *Id.* The MDA was approved and incorporated into the couple's final Divorce Decree. *Id.*

About "four and a half months" after the Divorce Decree was entered, Beale and Kurtz entered into another agreement. *Id.* In this agreement, Kurtz agreed to relinquish the $3,600 drapery debt in exchange for Beale's agreeing to finance the trade-in of the Jeep for a 2005 Dodge Grand Caravan. *Id.* In the end, Beale remained liable to Kurtz for the same amount as before, just on a different vehicle. *Id.*

---

obligated to the plaintiff under the terms of the requisite [separation] agreement or [court] order."); *In re Cheatham*, 2009 WL 2827951, *4 (N.D. Ohio Sept. 2, 2009)("to prevail on a Section 523(a)(15) claim, a plaintiff must establish that [among other things] the debt in question . . . was incurred in a separation agreement, divorce decree, or other order of a court of record."); *In re McClelland*, 247 B.R. 423, 427-28 (N.D. Ohio 2000)(generally agreeing with the proposition that "a debt can only be considered incurred in connection with a divorce decree, for purposes of Section 523(a)(15), when the decree itself creates an obligation to the former spouse which is new and independent . . . ."); *see also In re Burckhalter*, 389 B.R. 185, 188 (D. Colo. 2008)(noting that the plaintiff "must establish . . . that the obligation appears in a separation agreement, divorce decree or other order of a court of record.") This language implies that the defendant's debt would be dischargeable because it was not incurred in the MDA or the Divorce Decree itself. Importantly, however, the language of these cases does not arise in the context of a post-divorce private agreement between former spouses that makes reciprocal adjustments to obligations established in an MDA, and, therefore, these courts likely did not have the present situation in mind when making these statements.

About four months after the post-divorce agreement, Beale filed his Chapter 7 Petition, seeking to discharge his debts, and, shortly thereafter, Kurtz filed an adversary proceeding against her ex-husband, seeking to have the debt that her ex-husband owed to her from the car transactions declared non-dischargeable under Section 523(a)(15). The Bankruptcy Court ruled the debt non-dischargeable, and Beale appealed. *Id.*

Before the district court, Beale argued that the debt associated with his ex-wife's automobile was dischargeable because, among other things, it was now "unrelated to the Property Settlement Agreement." *Id.* at 731. In rejecting this argument, the district court noted that Section 523(a)(15) "cover[s] divorce-related debts that 'should not justifiably be discharged.'" *Id.* at 732 (quoting *In re Crosswhite*, 148 F.3d at 882). The court noted that the post-divorce agreement "specifically referenced the decree of dissolution" and that the MDA debts and the post-divorce debts were "certainly related," in that the nature of Beale's obligation (to pay for his ex-wife's vehicle) remained the same. *Id.* The court concluded that Beale had essentially "reaffirmed" his obligations through the post-divorce agreement and that "the circumstances suggest that the debt is one from which Beale should not justifiably be discharged" because to do so, in light of the circumstances, would be "unfair." *Id.* Therefore, the district court affirmed the decision of the Bankruptcy Court, finding the debt non-dischargeable under Section 523(a)(15).

The logic of this soundly reasoned case applies here as well, and the court concludes that, in every logical sense, the debt incurred through the November Agreement is "connected with" the MDA and the Divorce Decree, and, therefore, the debt is non-dischargeable under Section

13

523(a)(15). First of all, beyond explicitly mentioning the Divorce Decree numerous times in the November Agreement, the November Agreement concerns the same subject matter as addressed in the MDA. That is, the MDA is concerned with dividing up the interest in TLM and the parties' former marital home. The November Agreement, recognizing the difficulties that the parties had living under the terms of the MDA, changed the ownership interests in TLM and accelerated the payment to Mr. Woosley of his equity interest in the home. Clearly, this close association between the subject matter of the two agreements helps demonstrate a "connection" between the debt incurred in the November Agreement and the MDA/Divorce Decree.

The connection is further shown by the fact that, as in *Beale*, the fundamental nature of the debtor's obligation did not change between the two agreements. That is, in the MDA, Mr. Woosley agreed to retain 51 percent of his ex-father-in-law's former business, and he also agreed that Ms. Woosley would "continue to be allowed to work for [TLM] on a part-time basis as scheduling coordinator and office manager at her current salary level or as further agreed by the parties." (Adversary Proceeding, Docket No. 1 Ex. 1 at 4.) In essence, Mr. Woosley agreed that, until the parties agreed otherwise, TLM, the company that he now controlled, would help provide a living for Ms. Woosley. While several months passed between the MDA and the November Agreement, the obligations imposed by the November Agreement remained, in substance, the same as those in the MDA. That is, finding that they could no longer work together, the parties, as provided for by the MDA, "further agreed" that Mr. Woosley would buy Ms. Woosley's interest in TLM in exchange for monthly payments of $1,500 per month that would continue for ten years. Therefore, in essence, Mr. Woosley "reaffirmed" his previous

14

obligation and commitment to his ex-wife that TLM would be a source of revenue for her, even if the revenue came in a somewhat different form. The continuing nature of Mr. Woosley's obligation further demonstrates a "connection" between the debt and the MDA/Divorce Decree.

Finally, in interpreting the statutory meaning of "in connection with," it must be recalled that bankruptcy courts are courts of equity with broad powers to craft remedies that are fair under all of the circumstances. *In re Trailer Source, Inc.*, 555 F.3d 231, 242 (6th Cir. 2009). Here, just as in *Beale*, all of "the circumstances suggest that the debt is one from which [the defendant] should not justifiably be discharged."[5] It is uncontroverted that the plaintiff took less money in the form of alimony and other support because she counted on the $2,800 per month that working at TLM would provide. There is every indication that the plaintiff reasonably believed that, despite the dissolution of her marriage, TLM could help provide a good living for herself and her children, as the company had been in business for more than 30 years.

Whatever the reasons for the breakdown in the parties' working relationship, it is clear that, in the November Agreement, the plaintiff took less money still, agreeing to only $1,500 per month for ten years in exchange for leaving the company. Then, under the sole leadership of Mr. Woosley, the company collapsed and folded. Under all of these circumstances, to allow Mr. Woosley to walk away from these obligations would, as the plaintiff argues, allow him "to reap all of the benefits . . . and escape paying the consideration that he agreed to, effectively stealing

---

[5]Moreover, as a matter of policy, a ruling more narrowly interpreting the statutory phrase "in connection with" would encourage objectionable conduct inconsistent with the goals of the Bankruptcy Code. Specifically, it would reward a knowledgeable and unscrupulous spouse who, privately contemplating bankruptcy, re-negotiated the MDA with the appearance of fairness only to discharge in bankruptcy obligations previously agreed to.

15

[TLM] from Ms. Woosley and, indirectly, their children." (Docket No. 7 at 18.)

In light of close connection between the MDA/Divorce Decree and the November Agreement in terms of subject matter and obligation, and in light of the basic principles of equity and fairness to which Bankruptcy Law is tied, the court concludes that the debt incurred by the defendant in the November Agreement was incurred "in connection with a separation agreement [or] divorce decree" and, therefore, the debt is non-dischargeable under Section 523(a)(15) of the Bankruptcy Code.

## **CONCLUSION**

For the foregoing reasons, the May 28, 2009 Memorandum Opinion and Judgment of the Bankruptcy Court (Adversary Proceeding, Docket No. 72) will be affirmed on the single issue from that opinion that was appealed to this court.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

16

Case 3:09-cv-00910   Document 8   Filed 02/05/10   Page 16 of 16 PageID #: 1097